1  Raul Perez (SBN 174687)
   Raul.Perez@capstonelawyers.com
2  Arnab Banerjee (SBN 252618)
   Arnab.Banerjee@capstonelawyers.com
3  Brandon Brouillette (SBN 273156)
   Brandon.Brouillette@capstonelawyers.com
4  Capstone Law APC
   1875 Century Park East, Suite 1000
5  Los Angeles, California 90067
   Telephone:    (310) 556-4811
6  Facsimile:    (310) 943-0396

7  Attorneys for Plaintiff James Mortley

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 | JAMES MORTLEY, individually, and | Case No.: 8:17-cv-01938-JLS-JDE
   | on behalf of other members of the |
12 | general public similarly situated, | Honorable Josephine L. Staton
   |                                    |
13 |                  Plaintiff,        | **NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
14 |         vs.                        |
   |                                    |
15 | EXPRESS PIPE & SUPPLY CO., LLC,    |
   | a Delaware limited liability company; |
16 | MORRISON SUPPLY COMPANY,           | Date:    May 3, 2019
   | LLC, a Texas limited liability company; | Time:    10:30 a.m.
17 | and DOES 1 through 10, inclusive,  | Place:   Courtroom 10A
   |                                    |
18 |                  Defendants.       |

19

20

21

22

23

24

25

26

27

28

1  **TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS**
2  **OF RECORD:**

3      **PLEASE TAKE NOTICE** that on May 3, 2019 at 10:30 a.m., or as soon
4  thereafter as counsel may be heard, in Courtroom 10A of the above-captioned court,
5  located at 411 W. Fourth St., Santa Ana, California, 92701, the Honorable Josephine L.
6  Staton presiding, Plaintiff James Mortley will, and hereby does, move this Court for
7  entry of an order and judgment granting final approval of the class action settlement and
8  all agreed-upon terms therein. This Motion, unopposed by Defendants Express Pipe &
9  Supply Co., LLC, Morrison Supply Company, LLC, and Morsco Supply, LLC, seeks
10  final approval of:  (1) the Joint Stipulation of Class Action Settlement and Release and
11  amendments; (2) settlement payments to Participating Class Members, PAGA
12  Employees, and the LWDA; and (3) and costs/expenses to the settlement administrator,
13  Rust Consulting, Inc.

14      This Motion is based upon:  (1) this Notice of Motion and Motion; (2) the
15  Memorandum of Points and Authorities in Support of Motion for Final Approval of
16  Class Action Settlement; (3) the Declaration of Raul Perez; (4) the Declaration of Arnab
17  Banerjee; (5) the Declaration of Abigail Schwartz; (6) the Declaration of Keith A.
18  Jacoby; (7) the Declarations of Class Members Kevin Baumgardner, Jesus M. Gonzalez,
19  Junior Naranjo, and Sierra Peralta; (8) the [Proposed] Order Granting Final Approval of
20  the Class Action Settlement; (9) the records, pleadings, and papers filed in this action;
21  and (10) upon such other documentary and oral evidence or argument as may be
22  presented to the Court at or prior to the hearing of this Motion.

23  Dated:  April 5, 2019          Respectfully submitted,

24                     Capstone Law APC

25                  By: /s/ Raul Perez
26                     Raul Perez
                     Arnab Banerjee
                     Brandon Brouillette
27
28                     Plaintiff James Mortley

# TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................................1

II.   FACTS AND PROCEDURE...............................................................................3

    A.   Overview of the Litigation ........................................................................3

    B.   The Parties Settled After Mediation ........................................................4

    C.   The Proposed Settlement Fully Resolves Plaintiff's Claims .............................4

        1.   Composition of the Settlement Class.........................................4

        2.   Settlement Consideration.......................................................5

        3.   Formula for Calculating Settlement Payments.............................5

        4.   Release by the Settlement Class..............................................7

    D.   The Notice and Settlement Administration Process Were Completed Pursuant to the Court's Preliminary Approval Order............................7

    E.   Defendants Have Provided CAFA Notice.........................................8

III.  ARGUMENT........................................................................................................8

    A.   The Standard for Final Approval Has Been Met ...............................8

    B.   The Settlement Was Achieved After Evaluating the Strengths of Plaintiff's Case and the Risks, Expense, Complexity, and Likely Duration of Further Litigation............................................................10

        1.   Meal Period Claim ..............................................................11

        2.   Rest Period Claim................................................................13

        3.   Minimum Wage Claim .........................................................14

        4.   Wage Statement Claim .........................................................17

        5.   Waiting-Time Penalty Claim .................................................19

        6.   PAGA Claim......................................................................19

        7.   The Class Settlement Amount is Fair and Reasonable.............................22

    C.   The Settlement Was Reached through Arm's-Length Bargaining in Which All Parties Were Represented by Experienced Counsel......................23

1     D.   The Parties Conducted a Thorough Investigation of the Factual and

2           Legal Issues..................................................................................................24

3     E.   The Settlement Class Has Responded Positively to the Settlement................24

4     F.   The Requested Payment to the Settlement Administrator Is Reasonable

5           and Should Receive Final Approval ...............................................................25

6  IV.  CONCLUSION.........................................................................................................26

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

3    **FEDERAL CASES**

4    *Campbell v. Best Buy Stores, L.P.*, 2013 U.S. Dist. LEXIS 137792 (C.D.

5        Cal. Sept. 20, 2013)...................................................................................13

6    *Churchill Village, LLC v. General Electric*, 361 F.3d 566 (9th Cir. 2004)......................25

7    *Cotter v. Lyft, Inc.*, 193 F.Supp.3d 1030 (N.D. Cal. 2016) ..................................20

8    *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) ........................................23

9    *Fleming v. Covidien*, 2011 WL 7563047 (C.D. Cal. 2011)....................................20

10   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)...................................9, 10

11   *Hopson v. Hanesbrands Inc.*, Case No. 08-00844, 2009 U.S. Dist. LEXIS

12       33900 (N.D. Cal. Apr. 3, 2009) ..............................................................22

13   *In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL),

14       2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008) ............................23

15   *In Re Armored Car Antitrust Litig.*, 472 F. Supp. 1357 (N.D. Ga. 1979).....................22

16   *In Re Four Seasons Secs. Laws Litig.*, 58 F.R.D. 19 (W.D. Okla.1972)..........................23

17   *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y.

18       2004)..................................................................................................10

19   *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa.

20       2000)..................................................................................................10

21   *In re Michael Milken and Assoc. Sec. Litig.*, 150 F.R.D. 57 (S.D.N.Y.

22       1993)..................................................................................................10

23   *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...........................23

24   *Jimenez v. Allstate Ins. Co.*, 2012 WL 1366052 (C.D. Cal. Apr. 18, 2012) ....................13

25   *Loud v. Eden Med. Ctr.*, 2013 U.S. Dist. LEXIS 122873 (N.D. Cal. Aug.

26       28, 2013) ............................................................................................18

27   *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ...............................................10

28

*Nat'l Rural Telecom. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)................................................................................................................10

*Newman v. Stein*, 464 F. 2d 689 (2d Cir. 1972)...............................................10

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) ........9

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009)...........................9

**STATE CASES**

*7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135 (2000) ..............................................................................................25

*Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333 (2009) .....................................13

*Amaral v. Cintas Corp No. 2*, 163 Cal. App. 4th 1157 (2008)..........................19

*Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004 (2012) ..............................13

*Nordstrom Com. Cases*, 186 Cal. App. 4th 576 (2010)......................................22

*Tien v. Tenet Healthcare Corp.*, 209 Cal. App. 4th 1077 (2012).......................12

**FEDERAL STATUTES**

Fed. R. Civ. P. 23(e) .............................................................................................8

**SECONDARY AUTHORITIES**

Manual for Complex Litigation (4th ed. 2004).....................................................9

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

On December 27, 2018, the Court granted preliminary approval of the Joint Stipulation of Class Action Settlement and Release and amendments[1] and approved distribution of the Notice of Class Action Settlement ("Class Notice") to all Class Members. Class Members were given 45 days to opt out or object to the Settlement ("Response Deadline").[2] Plaintiff is pleased to report that to date:  (1) not a single Class Member has objected to the Settlement; (2) only one Class Member has opted out of the Settlement Class; (3) various Class Members have submitted declarations in support of the Settlement and this Motion for Final Approval; (4) the average payment from the Net Settlement Amount is approximately $1,324, and the highest is approximately $3,123. (Declaration of Raul Perez ["Perez Decl."] ¶¶ 46-47; Declaration of Abigail Schwartz ["Schwartz Decl."] ¶¶ 10-17.)

Plaintiff now seeks final approval of this Settlement with Defendants Express Pipe & Supply Co., LLC, Morrison Supply Company, LLC, and Morsco Supply, LLC ("Defendants" or "Express Pipe") (collectively with Plaintiff, the "Parties"). The principal terms of the Settlement provide for the following:

(1)    Conditional certification of a Settlement Class defined as:  All persons who have worked for Defendants as non-exempt, hourly-paid employees in California, including retail and warehouse locations, at any time from September 26, 2013 through November 30, 2018.

(2)    A **non-reversionary** Class Settlement Amount of $1,000,000. The Class Settlement Amount includes:

(a)    A Net Settlement Amount of approximately $591,666 (the Class Settlement Amount minus the requested Attorneys' Fees and Costs,

---

[1] Hereinafter, "Settlement" or "Settlement Agreement."  Unless indicated otherwise, all capitalized terms used herein have the same meaning as those defined by the Settlement Agreement.

[2] Re-mailed Class Notices were given an extended deadline of April 6, 2019. *See* Schwartz Decl. ¶ 14.

1     Settlement Administration Costs, the PAGA Settlement Payment,

2     and the requested Class Representative Enhancement Payment) and

3     a  PAGA Fund[3] of $7,500, which will be allocated to all

4     Participating Class Members and PAGA Employees on a pro-rata

5     basis according to the number of weeks that each Class Member

6     and PAGA Employee worked during the Class Period and PAGA

7     Period.  **Because the Class Settlement Amount is non-**

8     **reversionary, 100% of the Net Settlement Amount will be paid**

9     **to all Participating Class Members, and 100% of the PAGA**

10     **Fund will be paid to all PAGA Employees, and without the**

11     **need to submit claims for payment.**

12     (b)    Attorneys' fees not to exceed one-third of the Class Settlement

13     Amount (or $333,334) and litigation costs and expenses not to

14     exceed $20,000, to Capstone Law APC ("Plaintiff's Counsel").

15     (c)    Settlement Administration Costs of $15,000 to Rust Consulting,

16     Inc. ("Rust").

17     (d)    A Class Representative Enhancement Payment of $10,000 to James

18     Mortley for his service on behalf of the Settlement Class and for

19     agreeing to a broader release than those required of other Class

20     Members.

21     An objective evaluation of the Settlement confirms that the relief negotiated on

22 the Class' behalf is fair, reasonable, and valuable. The Settlement was negotiated by the

23 Parties at arm's length with helpful guidance from the Honorable Michael D. Marcus

24 (Ret.), an experienced and well-respected class action mediator, and the Settlement

25 confers substantial benefits to Class Members and PAGA Employees. The relief offered

26

27     [3] The PAGA Fund will be allocated on a pro-rata basis to all all persons who have
worked for Defendants as non-exempt, hourly-paid employees in California, including

28 retail and warehouse locations, at any time from September 26, 2016 through the date of
Preliminary Approval ("PAGA Employees").

by the Settlement to Class Members and PAGA Employees—**averaging approximately $1,324**—is particularly impressive when viewed against the difficulties encountered by plaintiffs pursuing wage and hour cases. Indeed, by settling now rather than proceeding to trial, Class Members and PAGA Employees will not have to wait (possibly years) for relief, nor will they have to bear the risk of class certification being denied or of Defendants prevailing at trial.

Accordingly, given the Settlement's favorable terms and the manner in which these terms were negotiated and received by Class Members, Plaintiff respectfully requests that the Court grant this Motion for Final Approval of the Settlement Agreement and retain jurisdiction to enforce the Settlement.

## II.    FACTS AND PROCEDURE

### A.    Overview of the Litigation

Express Pipe is a plumbing supply and services retailer operating approximately 14 "Express Pipe" locations in California. Plaintiff James Mortley worked for Express Pipe as an hourly, non-exempt employee from approximately March 2013 to December 2016 at its warehouse location at Anaheim, California. Mr. Mortley began working as a nighttime Warehouse Associate, then worked as a swing shift Warehouse Associate, and eventually worked at the customer service counter.

On September 26, 2017, Mr. Mortley filed a class action complaint against Express Pipe in Orange County Superior Court, seeking to bring claims on behalf of non-exempt, hourly-paid employees in California, including employees working at retail and warehouse locations, within four years prior to the filing of the complaint until the date of trial. (Declaration of Raul Perez ["Perez Decl."] ¶ 2.)

The complaint asserted claims against Express Pipe for violations of the following Labor Code sections: (1) 510 and 1198 (unpaid overtime); (2) 1194, 1197, and 1197.1 (unpaid minimum wages); (3) 226.7 and 512(a) (failure to provide meal periods); (4) 226.7 (failure to provide rest periods); (5) 226(a), 1174(d), and 1198 (failure to provide compliant wage statements and maintain accurate payroll records); (6) 201

and 202 (wages not timely paid upon termination); (7) 2802  (unreimbursed business expenses); (8) California Business & Professions Code sections 17200, *et seq* (Unlawful Business Practices); and (9) California Business & Professions Code sections 17200, *et seq* (Unfair Business Practices). (Perez Decl. ¶ 3.)

On November 2, 2017, Express Pipe removed the case to the United States District Court, Central District of California. Thereafter, the parties participated in both formal and informal discovery. After Plaintiff's deposition, the parties began discussing mediation and agreed to focus on the discovery necessary for mediation. Pursuant to that agreement, Express Pipe agreed to produce all pertinent policy documents, and a 20% sample of payroll and timekeeping data, which Plaintiff's expert analyzed in advance of mediation. (Perez Decl. ¶ 4.)

**B.      The Parties Settled After Mediation**

On June 27, 2018, the Parties participated in a full day of mediation with the Honorable Michael D. Marcus (Ret.), an experienced mediator of wage and hour class actions. Judge Marcus helped to manage the Parties' expectations and provided a useful, neutral analysis of the issues and risks to both sides. With Judge Marcus' guidance, the Parties were able to negotiate a complete settlement of Plaintiff's claims. The terms of the settlement are now set forth in complete and final form in the Joint Stipulation of Class Action Settlement and Release. At all times, the Parties' negotiations were adversarial and non-collusive. The Settlement therefore constitutes a fair, adequate, and reasonable compromise of the claims at issue. (Perez Decl. ¶ 5.)

**C.      The Proposed Settlement Fully Resolves Plaintiff's Claims**

**1.      Composition of the Settlement Class**

The Settlement Class consists all persons who have worked for Defendants as non-exempt, hourly-paid employees in California, including retail and warehouse locations, at any time from September 26, 2013 through November 30, 2018. (Settlement Agreement ¶ 5; *see also* Second Amendment to Settlement Agreement.)

### 2.      Settlement Consideration

Plaintiff and Defendants have agreed to settle all class claims and representative claims alleged in the action in exchange for the Class Settlement Amount of $1,000,000. The Class Settlement Amount includes: (1) Individual Settlement Payments; (2) $333,334 in attorneys' fees and up to $20,000 in litigation costs/expenses to Plaintiff's Counsel; (3) a PAGA Settlement Payment of $30,000, of which 75% ($22,500) will be paid to the LWDA, and 25% ($7,500) will be distributed to PAGA Employees; (4) Settlement Administration Costs of $15,000; and (5) a Class Representative Enhancement Payment of $10,000 to Plaintiff James Mortley for his service on behalf of the Settlement Class and for a general release of all claims arising out of his employment. (Settlement Agreement ¶¶ 2, 7-8, 14, 28.)

Subject to the Court approving Attorneys' Fees and Costs, the PAGA Settlement Payment, Settlement Administration Costs, and the Class Representative Enhancement Payment, the Net Settlement Amount will be distributed to all Participating Class Members and the PAGA Fund will be distributed to all PAGA Employees. Because the Class Settlement Amount is non-reversionary, 100% of the Net Settlement Amount/PAGA Fund will be distributed to Class Members/PAGA Employees, and without the need to submit claims for payment.[4] (*Id.* at ¶¶ 15, 37-38.)

### 3.      Formula for Calculating Settlement Payments

Individual Settlement Payments will be calculated and apportioned from the Net Settlement Amount and PAGA Fund based on the number of Workweeks that Participating Class Members and PAGA Employees worked during the Class Period and PAGA Period. (Settlement Agreement ¶ 38.) Specific calculations of Individual Settlement Payments will be made as follows:

---

[4] Although the Parties had originally intended to tender unclaimed funds to the California Department of Industrial Relations ("DIR") Unpaid Wages Fund, the Settlement Administrator has since informed the Parties that the DIR no longer accepts unclaimed settlement funds. The Parties have accordingly agreed to tender such funds instead to the California State Controller's Office, Unclaimed Property Division. *See* Perez Decl., Ex. 2, Third Amendment to the Joint Stipulation of Class Action Settlement and Release.

**Payments from Net Settlement Amount**. The Settlement Administrator will calculate the total number of Workweeks worked by each Class Member during the Class Period and the aggregate total number of Workweeks worked by all Class Members during the Class Period. To determine each Class Member's estimated share of the Net Settlement Amount, the Settlement Administrator will use the following formula:  The Net Settlement Amount will be divided by the aggregate total number of Workweeks, resulting in the "Workweek Value."  Each Class Member's share of the Net Settlement Amount will be calculated by multiplying each individual Class Member's total number of Workweeks by the Workweek Value. The Individual Settlement Payment will be reduced by any required deductions for each Class Members as specifically set forth herein, including employee-side tax withholdings or deductions. Former employees will be allocated an additional six weeks to compensate them for the claim for waiting time penalties. The entire Net Settlement Amount will be disbursed to all Class Members who do not submit timely and valid Requests for Exclusion.  If there are any valid and timely Requests for Exclusion, the Settlement Administrator shall proportionately increase each Participating Class Member's share of the Net Settlement Amount according to the number of Workweeks worked, so that the amount actually distributed to the Settlement Class equals 100% of the Net Settlement Amount.

**Payments from PAGA Fund**. The Settlement Administrator will calculate the total number of Workweeks worked by each PAGA Employee during the PAGA Period and the aggregate total number of Workweeks worked by all PAGA Employees during the PAGA Period. To determine each PAGA Employee's estimated share of the PAGA Fund, the Settlement Administrator will use the following formula:  The PAGA Fund will be divided by the aggregate total number of Workweeks, resulting in the "PAGA Workweek Value."  Each PAGA Employee's share of the PAGA Fund will be calculated by multiplying each individual Participating PAGA Employee's total number of Workweeks by the PAGA Workweek Value. A Request for Exclusion does not exclude a PAGA Employee from the release of claims under California Labor Code §§

2698, *et seq.* and the PAGA Employee will receive their portion of the PAGA fund even if he or she submits a valid Request for Exclusion.

### 4.    Release by the Settlement Class

In exchange for the Class Settlement Amount, Plaintiff, Participating Class Members, and PAGA Employees will agree to release the Released Parties for the Released Claims, which are defined as:

> All claims, rights, demands, liabilities, and causes of action, arising from, or related to, the same set of operative facts as those set forth in the operative complaint during the Class Period, including: (a) all claims for unpaid overtime; (b) all claims for meal and rest break violations; (c) all claims for unpaid minimum wages; (d) all claims for the failure to timely pay wages upon termination; (e) all claims for the failure to timely pay wages during employment; (f) all claims for wage statement violations; and (g) all claims asserted through California Business & Professions Code §§ 17200, et seq., and California Labor Code §§ 2698, et seq. based on the preceding claims.

(Settlement Agreement ¶ 24.)

### D.    The Notice and Settlement Administration Process Were Completed Pursuant to the Court's Preliminary Approval Order

As authorized by the Court's Order preliminarily approving the Settlement Agreement, the Parties engaged Rust to provide settlement administration services. (Schwartz Decl. ¶ 3.) On December 28, 2018, Rust received the Class Notice prepared jointly by Plaintiff's Counsel and counsel for Defendants and approved by the Court. (Schwartz Decl. ¶ 7.) The Class Notice summarized the Settlement's principal terms, provided Class Members with an estimate of how much they would be paid if the Settlement received final approval, and advised Class Members about how to opt out of the Settlement and how to object. (Schwartz Decl., Ex. A.)

Separately, counsel for Defendants provided Rust with a mailing list (the "Class List"), which included each Class Member's full name, last known address, Social Security Number, and information necessary to calculate payments. (Schwartz Decl. ¶ 8.) The mailing addresses contained in the Class List were processed and updated using the National Change of Address Database maintained by the U.S. Postal Service. (*Id.* at ¶ 9.) On February 5, 2019, Rust mailed Class Notices to Class Members via First-Class

1    U.S. mail. (*Id.* at ¶ 10.)  Class Members were given until March 22, 2019 to opt out or

2    object to the Settlement. Plaintiff is pleased to report that to date, no Class Members

3    have objected to the Settlement, and only one Class Member has opted out of the

4    Settlement Class. (Perez Decl. ¶ 46-47.) Additionally, several Class Members have

5    submitted declarations in support of this motion. (*See* Declaration of Kevin

6    Baumgardner ¶¶ 2-6, Declaration of Jesus M. Gonzalez ¶¶ 2-6, Declaration of Junior

7    Naranjo ¶¶ 2-6, and Declaration of Sierra Peralta ¶¶ 1-5.

8            **E.    Defendants Have Provided CAFA Notice**

9            On November 13, 2018, counsel for Defendants sent letters to the U.S.

10   Department of Justice, California Department of Labor Standards Enforcement, United

11   States Department of Labor, and California State Attorney General in order to comply

12   with Section 1715 of the Class Action Fairness Act of 2005 ("CAFA") with regards to

13   this Settlement. (Declaration of Keith A. Jacoby ["Jacoby Decl."] ¶ 2, Ex. A.)

14           Following preliminary approval, Defendants determined that one Class Member,

15   who had previously lived and worked in California, had since moved to Wisconsin. As

16   such, on January 11, 2019, counsel for Defendants sent supplemental letters to the U.S.

17   Department of Justice, California Department of Labor Standards Enforcement, United

18   States Department of Labor, California State Attorney General, Wisconsin Department

19   of Justice, and Wisconsin Department of Workforce Development in order to comply

20   with Section 1715 of the CAFA with regards to this settlement. (Jacoby Decl. ¶ 3, Ex.

21   B.)

22   **III.    ARGUMENT**

23           **A.    The Standard for Final Approval Has Been Met**

24           A class action may only be settled, dismissed, or compromised with the Court's

25   approval. Fed. R. Civ. Proc. 23(e). The process for court approval of a class action

26   settlement is comprised of three principal stages:

27           Preliminary Approval:  The proposed settlement agreement is preliminarily

28   reviewed by the Court for fairness, adequacy, and reasonableness. If the Court believes

the settlement falls within the range of reasonableness, such that proceeding to a formal fairness hearing is warranted, it orders notice of the settlement disseminated to the class. *See* Manual for Complex Litigation § 21.632 (4th ed. 2004).

Class Notice:  Notice of the settlement is disseminated to the class, giving class members an opportunity to object to the settlement's terms or preserve their right to bring an individual action by opting out. *See id.*, § 21.633.

Final Approval:  A formal fairness or final-approval hearing is held by the Court, at which class members can be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented.[5]  Following the hearing, the Court decides whether to approve the settlement and enter a final order and judgment. *See id.*, § 21.634.

The first two steps have been completed. The Court has preliminarily reviewed the proposed settlement for fairness and found it to be within the range of reasonableness meriting court approval. (*See* Order Granting Preliminary Approval of Class Settlement, Dkt. No. 34.)  In addition, the Settlement Administrator has notified Class Members of the proposed settlement and upcoming fairness hearing as directed by the Court. (*See generally* Schwartz Decl.)  Plaintiff now asks the Court to grant final approval of the proposed settlement.

The decision about whether to approve the proposed settlement is committed to the sound discretion of the trial judge, and will not be overturned except upon a strong showing of a clear abuse of discretion. *Hanlon*, 150 F.3d at 1026-1027.  The Ninth

---

[5] A proposed class action settlement may be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "fair, reasonable, and adequate."  In making this determination, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (*quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation . . . .").

Circuit has set forth a list of non-exclusive factors that a district court should consider in deciding whether to grant final approval, namely: (1) the strength of plaintiffs' case, and the risk, expense, complexity, and likely duration of further litigation; (2) the risk of maintaining class action status throughout the trial; (3) the amount offered in settlement; (4) the extent of discovery completed, and the stage of the proceedings; (5) the experience and views of counsel; and (6) the reaction of the class members to the proposed settlement. *Id.* at 963 (*citing Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003)).

These factors, which are discussed below, confirm that the proposed settlement is more than fair, reasonable, and adequate for Class Members. The settlement provides considerable value; Class Members need not bear the risk and delay associated with trial proceedings to obtain these benefits; and the Settlement has been met with substantial support and no opposition from Class Members.

**B.    The Settlement Was Achieved After Evaluating the Strengths of Plaintiff's Case and the Risks, Expense, Complexity, and Likely Duration of Further Litigation**

Federal district courts recognize that there is an inherent "range of reasonableness" in determining whether to approve a settlement "which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Id.* at 188, *quoting Newman v. Stein*, 464 F. 2d 689, 693 (2d Cir. 1972). *See Nat'l Rural Telecomm. Coop. v. Directv, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery").[6]

As explained in detail below, the Class Settlement Amount is within the range of

---

[6] *See also In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) ("settlement amount's ratio to the maximum potential recovery need not be the sole, or even dominant, consideration when assessing settlement's fairness"); *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("the fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement; rather the percentage should be considered in light of strength of the claims").

1  reasonableness in light of the nature and magnitude of the claims being settled and the

2  various potential impediments to recovery.  Plaintiff's Counsel determined an

3  appropriate range of recovery for settlement purposes by offsetting Defendants'

4  maximum theoretical liability by:  (i) the strength of Defendants' defenses on the merits,

5  as most of their actual written labor policies are—on their face—compliant with

6  California law; (ii) the risk of class certification being denied; (iii) the risk of losing on

7  any of a number of dispositive motions that could have been brought between

8  certification and trial (e.g., motions to decertify the class, motions for summary

9  judgment, and/or motions in limine) that might have eliminated all or some of Plaintiff's

10  claims; (iv) the risk of losing at trial (including the Court deeming the trial

11  unmanageable on a representative basis); (v) the chances of a favorable verdict being

12  reversed on appeal; and (vi) the difficulties attendant to collecting on a judgment. (Perez

13  Decl. ¶ 8.)

14              **1.    Meal Period Claim**

15          Plaintiff alleges that Class Members routinely had their meal periods delayed

16  and/or interrupted during busy periods that required employees to postpone taking their

17  meal periods until after the fifth hour of work, and on occasion return to work during

18  meal periods while off-the-clock. Plaintiff alleges that this was attributable to

19  understaffing, which did not allow proper break coverage for employees to take their

20  breaks, and shipping/delivery deadlines that were prioritized over employee meal breaks.

21  (Perez Decl. ¶ 9.)

22          "An employer may not employ an employee for a work period of more than five

23  hours per day without providing the employee with a meal period of not less than 30

24  minutes." Cal. Lab. Code § 512(a). Additionally, an employee may not work more than

25  10 hours without being provided a second meal period. *Id.* Where an employee does not

26  receive a timely meal period of at least 30 minutes, the employer is required to pay the

27  employee one additional hour of pay at the employee's regular rate of compensation.

28  Cal. Lab. Code § 226.7(b). (Perez Decl. ¶ 10.)

From a sample of time records produced for mediation, Plaintiff's expert found that 67% of employee shifts over 5 hours had a non-compliant first or second meal period that was either missed, late, or short. This equates to 63.5% of all shifts. Based thereon, Defendants' maximum potential exposure for this claim is as follows: 189,115 total shifts × 63.5% violation rate × $17.47 average hourly wage ≈ $2,097,940. (Perez Decl. ¶ 11.)

In their defense, Defendants would have argued that their written meal period policies are entirely consistent with the Labor Code, and that they discharged their obligations to Class Members by making meal periods "available," and that they were not obligated to ensure that Class Members actually ceased all work during their meal periods. *See Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1034 (2012) ("an employer must relieve the employee of all duty for the designated period, but need not ensure that the employee does no work"). (Perez Decl. ¶ 12.)

In response, Plaintiff would have countered that an employer "may not undermine a formal policy of providing [breaks] by pressuring employees to perform their duties in ways that omit breaks," which is what Plaintiff specifically alleges that Defendants did here by pressuring Class Members to work during their meal periods. *See Brinker* at 1040 (citing *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 962–963, (2005). *See also Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 638 (S.D. Cal.2010) (indicating informal anti-meal-break policy "enforced through 'ridicule' or 'reprimand'" would be illegal.). (Perez Decl. ¶ 13.)

Even though Plaintiff's allegations were sustained by evidence of violations recorded in Defendants' payroll records, it may have been difficult to establish that Defendants did in fact undermine their formal meal period policy by systematically pressuring Class Members to work during their breaks. Indeed, some courts have been reluctant to certify meal period claims based upon such an unlawful *practices* (rather than unlawful *policy*) theory of liability. *See Tien v. Tenet Healthcare Corp.*, 209 Cal. App. 4th 1077, 1088 (2012) ("[T]he reason, if any, that employees might not take their

breaks were predominantly individualized questions of fact not susceptible to class treatment."); *Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333, 1341 (2009) (affirming denial of certification because employees' declarations attesting to having taken meal and rest breaks demonstrated that individualized inquiries were required to show harm); *Campbell v. Best Buy Stores, L.P.*, 2013 U.S. Dist. LEXIS 137792, at *30-41 (C.D. Cal. Sept. 20, 2013) (following *Brinker* and denying certification of proposed off-the-clock and rest and meal break classes due to lack of uniform policy); *Jimenez v. Allstate Ins. Co.*, 2012 U.S. Dist. LEXIS 65328 (C.D. Cal. Apr. 18, 2012) (denying motion to certify meal and rest break classes based on employer's practice of understaffing and overworking employees). (Perez Decl. ¶ 14.)

After taking into account the foregoing and the Discount Factors, Plaintiff estimated the settlement value of the meal period claim at approximately $209,794 and $419,588. (Perez Decl. ¶ 15.)

## 2. Rest Period Claim

Plaintiff alleges that Defendants unlawfully prohibit employees from leaving the work site during their rest periods. Thus, Defendants allegedly violated the requirements of Wage Order 5 and the Labor Code by not allowing employees to use their rest breaks for their own purposes. (Perez Decl. ¶ 16.)

Under the IWC Wage Orders, an employer is required to authorize and permit all employees to take duty free rest periods at the rate of at least 10 minutes for every four hours worked or major fraction thereof. 8 Cal. Code Regs. § 11020 (12). When an employer fails to provide an employee a paid rest period in accordance with the Wage Order, that employer shall pay the employee one hour of pay at the employee's regular rate of pay for each work day that the rest period is not provided. 8 Cal. Code of Reg. § 11020(12)(B); Cal. Lab. Code § 226.7(b). (Perez Decl. ¶ 17.)

On December 22, 2016, the California Supreme Court ruled that employers "must relieve employees of all duties and relinquish control over how employees spend their time," which arguably includes control over the locations where employees may take

their rest period. *See Augustus v. ABM Security Servs., Inc.*, 2 Cal.5th 257, 269–70 (2016) (employees must be free of employer control during rest breaks so that they may "take a brief walk—five minutes out, five minutes back."). (Perez Decl. ¶ 18.)

Because Defendants' rest period policy applied to all Class Members, Plaintiff alleges that all rest periods taken by Class Members during the Class Period resulted in a rest period violation. Plaintiff determined that approximately 99% of all employee shifts were greater or equal to 3.5 hours, which means that at least one rest period had to be authorized and permitted. Defendants' argued that this policy was not implemented, and thus not all employees were denied rest breaks.  That said, based on Plaintiff's Counsel experience litigating claims of this nature, counsel estimates that 25% of employees left the premises during their rest breaks, notwithstanding the policy.  Thus, Defendants' maximum potential exposure is as follows:  189,115 total shifts x 99% × $17.47 average hourly rate × 75% ≈ $2,453,100. (Perez Decl. ¶ 19.)

Plaintiff's Counsel determined an appropriate range of recovery for the rest period claim for settlement purposes by offsetting Defendants' maximum theoretical exposure by the Discount Factors. With respect to defenses, Defendants would have argued that *Augustus* did not specifically address the requirement that employees remain at the worksite during their rest period; rather, *Augustus* addressed whether employers could satisfy their obligation to relieve employees from duties and control during rest periods while still having to remain on-call. Defendants would have also argued that their on-premises rest break policy was not actually enforced, and that there is no published opinion yet adopting Plaintiff's theory of liability. (Perez Decl. ¶ 20.)

After taking into account the foregoing and the Discount Factors, Plaintiff estimated the settlement value of the rest period claim at between approximately $245,310 and $490,620. (Perez Decl. ¶ 21.)

### 3.    Minimum Wage Claim

Plaintiff alleges that he and other Class Members were required to undergo multiple drug and medical tests during their employment off-the-clock and without

1    compensation in clear violation of California law. (Perez Decl. ¶ 22.)

2          California law defines "hours worked" as "the time during which an employee is

3    subject to the control of an employer, and includes all the time the employee is suffered

4    or permitted to work, whether or not required to do so." *Morillon,* 22 Cal. 4th at 578.

5    Thus, "an employee who is subject to an employer's control does not have to be working

6    during that time to be compensated." *Morillion*, 22 Cal. 4th at 582; *see also* 8 Cal. Code

7    Regs. § 11070 subd. 2(g) (defining "hours worked" as the "time during which an

8    employee is subject to the control of an employer, and includes all the time the employee

9    is suffered or permitted to work, whether or not required to do so."). Requiring

10   employees to work without compensation violates California's minimum wage and

11   overtime laws. *See* Cal. Lab. Code §§ 510, 1194, 1197, 1197.1 and 1198. An employer

12   is liable for off-the-clock "hours worked" if it "knew or should have known off-the-

13   clock work was occurring." *Brinker*, 53 Cal. 4th at 1051-52. (Perez Decl. ¶ 23.)

14         The United States Department of Labor has weighed in on the issue and advises

15   as follows:

16           After being hired, employers often require their employees to
     take certain tests **as they begin employment**… such as …

17   drug testing. Whenever you impose special tests,
     requirements or conditions that your employee must meet,

18   time he or she spends traveling to and from the tests, waiting
     for and undergoing these tests, or meeting the requirements

19   is probably hours worked.

20   The Department of Labor explains that "[t]ime spent in these activities is time during

21   which the employee's freedom of movement is restricted for the purpose of serving your

22   business and during which he or she is subject to your discretion and control." (Perez

23   Decl. ¶ 24.)

24         Assuming that, like Plaintiff, all Class Members underwent two such exams

25   which took on average 2.5 hours, Defendants' maximum potential exposure would be

26   calculated as follows: 450 class members × 5 hours × $17.47 ≈ $40,000. (Perez Decl. ¶

27   25.)

28         With respect to affirmative defenses, Defendants would have argued that

activities undertaken by job applicants at the time of hiring—such as employer-mandated drug tests and physical examinations—are not "work" performed by an "employee," and are therefore not compensable time. *See Gunawan v. Howroyd-Wright Employment Agency*, 997 F. Supp. 2d 1058, 1062 (C.D. Cal. 2014). In *Gunawan*, following a job interview, a prospective employee was sent to a second interview with one of the prospective employer's clients. After an employment relationship was later established, the plaintiff sought compensation for the time spent on the second interview. The court held that a prospective employee is not "entitled to payment of the minimum wage for time spent interviewing for prospective employment" and granted summary judgment because, during these pre-employment tasks, Gunawan "was not an employee of KForce performing compensable work." *Id.* (finding that section 1194 "[q]uite clearly . . . contemplates that only an employee, and not a prospective employee or applicant for employment, can recover"). (Perez Decl. ¶ 26.)

Defendants would also have argued that under *Morillon*, an employer does not exercise "control" over employees by simply requiring them to appear at some specific destination. *Id.* at 583 (rejecting argument that commuting and grooming would be paid under the "control" rule because the "level of the employer's control over its employees, *rather than the mere fact that the employer requires activity*, is determinative") (emphasis added). *See also Gunawan*, 997 F. Supp. 2d at 1063 (finding time spent on second interview was not under "control" of prospective employer because, although company sent applicant to second interview and controlled communications with second interviewer, there was "no evidence that KForce had control over the questions asked . . . or more importantly, over the answers she provided . . . over the length . . . or that KForce required Ms. Gunawan to act in a certain manner while she was there"). Because these arguments, if accepted, would serve as complete defenses to the merits of Plaintiff's claim, Plaintiff determined an appropriate settlement range of $4,000 and $8,000. (Perez Decl. ¶ 27.)

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1

### 4.     Wage Statement Claim

2          Plaintiff alleges that Defendants issued wage statements which failed to include

3    the legal name of the employer as required by Labor Code section 226(a)(8)—instead

4    the wage statement issued incorrectly reference "Anaheim" (i.e. location of the

5    warehouse) where the employer name(s) should be. (Perez Decl. ¶ 28.)

6          Labor Code section 226(a) provides, in pertinent part, that an employer must

7    provide an "accurate itemized" wage statement showing net and gross wages earned.

8    Cal. Lab. Code § 226(a). "[A]n employee has a statutory right to an accurate pay stub."

9    *Jaimez v. Daiohs USA, Inc.*, 181 Cal. App. 4th 1286, 1306 (2010) ("*Jaimez*"). "The

10   purpose of the wage statement requirement is to provide transparency as to the

11   calculation of wages. A complying wage statement accurately reports most of the

12   information necessary for an employee to verify if he or she is being properly paid in

13   accordance with the law and that deductions from wages are proper." DLSE Opinion

14   Letter 2006.07.06 at 2. One of the requirements for a legally compliant wage statement

15   is that it includes "the name and address of the legal entity that is the employer." Labor

16   Code § 226(a)(8) (emphasis added). (Perez Decl. ¶ 29.)

17         Penalties for wage statement violations are calculated according to the formula

18   provided by Labor Code section 226(e)(1): An employee suffering injury as a result of a

19   knowing and intentional failure by an employer to comply with subdivision (a) is

20   entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial

21   pay period in which a violation occurs and one hundred dollars ($100) per employee for

22   each violation in a subsequent pay period, not to exceed an aggregate penalty of four

23   thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's

24   fees.

25         However, Defendants would have argued (by analogy to case law interpreting

26   penalties under Labor Code sections 201 and 225.5), that it would be improper to assess

27   $100 penalties for "subsequent violations" as there has been no formal finding of any

28   "initial" violations.  *See Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1209

1    (2008) ("Although common sense might suggest a "subsequent" violation is nothing

2    more than a violation that occurs at a later point in time after an "initial" violation, this

3    definition is inadequate because the statutes provide for multiple penalties for "each

4    failure to pay each employee" incurred in an initial violation . . . Until the employer has

5    been notified that it is violating a Labor Code provision (whether or not the

6    Commissioner or court chooses to impose penalties), the employer cannot be presumed

7    to be aware that its continuing underpayment of employees is a "violation" subject to

8    penalties.")

9        While Plaintiff regards this interpretation as flawed, he decided to conservatively

10   estimate Defendants' maximum potential exposure for wage statement penalties by

11   assessing a $50 penalty for all pay periods at issue: 8,297 pay periods x $50 = $414,850.

12   (Perez Decl. ¶ 32.)

13       Plaintiff had to further discount Defendants' exposure by the strength of their

14   affirmative defenses and the risks of continued litigation.  With respect to the affirmative

15   defenses, defendants commonly argue that, without more, wage statement claims are

16   nothing but technical violations for which Class Members suffer no injury.  Before

17   Section 226(e) was amended, the dispositive issue was whether "suffering injury" was

18   satisfied by the deprivation of a legal right (i.e., an employer's provision of non-

19   compliant wage statements), or by consequential damages caused by the non-compliant

20   wage statements.  Employers in federal court have prevailed in arguing for the latter

21   interpretation.  Even after the enactment of section 226(e), some courts have held that

22   this amendment merely clarifies existing law and have held that plaintiffs must

23   demonstrate actual injury.  *See Loud v. Eden Med. Ctr.*, 2013 U.S. Dist. LEXIS 122873,

24   **36-53 (N.D. Cal. Aug. 28, 2013) (granting summary judgment on wage statement

25   claim because plaintiff could not show injury due to defects and that incorrect wage

26   information is not willful). (Perez Decl. ¶ 33.)

27       After accounting for the risks of continued litigation as to each of the above

28   claims (*see below*), Plaintiff valued the wage statement claim for settlement purposes at

1   between approximately $41,485 and $82,970. (Perez Decl. ¶ 34.)

2   **5.    Waiting-Time Penalty Claim**

3   Where an employer "willfully fails" to timely pay wages upon termination of

4   employment, "the wages of the employee shall continue as a penalty from the due date

5   thereof at the same rate until paid or until an action therefor is commenced," for up to

6   thirty days. *See* Cal. Labor Code § 203. (Perez Decl. ¶ 35.)

7   Plaintiff estimated Defendants' maximum potential exposure for 203 penalties at

8   $1,425,552, which was calculated by taking the product of the following: [340 former

9   employees during the 3-year SOL] x [8-hour average shift] x [$17.47 average hourly

10  wage] x [30 days of penalties] = $1,425,552. Plaintiff recognizes that Defendants would

11  have argued that an employer has a complete defense to a waiting-time penalty claim

12  based on a showing of good faith.  *Amaral v. Cintas Corp No. 2*, 163 Cal. App. 4th

13  1157, 1204 (2008) ("So long as no other evidence suggests the employer acted in bad

14  faith, presentation of a good faith defense, based in law or fact, will negate a finding of

15  willfulness.") (Perez Decl. ¶ 36.)

16  **6.    PAGA Claim**

17  Based on the forgoing allegations, Plaintiff alleges that Defendants are liable for

18  civil penalties under PAGA. While the method of calculating PAGA penalties is

19  straightforward, the analysis becomes more difficult for settlement purposes as PAGA

20  penalty claims are only as strong as the underlying predicate claims.

21  Based on information and evidence produced by Defendants during discovery,

22  Plaintiff's Counsel determined that aggrieved employees worked a combined total of

23  8,297 pay periods during the PAGA statute of limitations period ("PAGA Period").

24  Statutory penalties would be calculated according to Labor Code 2699(f)(2): If, at the

25  time of the alleged violation, the person employs one or more employees, the civil

26  penalty is one hundred dollars ($100) for each aggrieved employee per pay period for

27  the initial violation and two hundred dollars ($200) for each aggrieved employee per pay

28  period for each subsequent violation. (Perez Decl. ¶ 28.)

1    That said, that some courts have interpreted Labor Code section 2699(f)(2) to

2    impose the enhanced "subsequent violation penalty" or "heightened penalty" only after

3    an employer has been notified that its conduct violates the Labor Code.  *See Trang v.*

4    *Turbine Engine Components Technologies Corp.*, No. CV 12–07658 DDP (RZx), 2012

5    WL 6618854 (C.D. Cal. Dec. 19, 2012) ("courts have held that employers are not

6    subject to heightened penalties for subsequent violations unless and until a court or

7    commissioner notifies the employer that it is in violation of the Labor Code");

8    *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc.*,

9    No. 05cv1199–IEG–CAB, 2009 WL 2448430 (S.D. Cal. 2009) (finding that California

10   law imposes the "subsequent violation penalty" only after an employer has been notified

11   its conduct violates the Labor Code).  While Plaintiff regards this interpretation as

12   flawed, he nonetheless recognizes that this interpretation has gained traction with some

13   courts, and elected therefore to conservatively estimate Defendants' maximum potential

14   exposure for PAGA penalties by assessing a $100 penalty for all pay periods during the

15   one-year statute of limitations. (Perez Decl. ¶ 39.)

16   It should also be noted that the PAGA gives the Court wide latitude to reduce the

17   amount of civil penalties "based on the facts and circumstances of a particular case"

18   when "to do otherwise would result in an award that is unjust, arbitrary and oppressive,

19   or confiscatory." Cal. Lab. Code § 2699(h). In reducing PAGA penalties, courts have

20   considered issues including whether the employees suffered actual injury from the

21   violations, whether the defendant was aware of the violations, and the employer's

22   willingness to fix the violation. *Cotter v. Lyft, Inc.*, 193 F.Supp.3d 1030, 1037 (N.D. Cal.

23   2016); *Fleming v. Covidien*, 2011 WL 7563047, at *4 (C.D. Cal. 2011). For instance, in

24   the *Lyft* case, the Court found that a $1 million PAGA settlement was fair and reasonable

25   in light of the unsettled nature of the law, resulting in a $2.52 per pay period award to the

26   aggrieved employees (there were 397,110 pay periods in a $1 million PAGA settlement,

27   resulting in a 97.5% reduction from the maximum). In *Fleming v. Covidien*, the Court

28   reduced the potential penalties by over 82%, awarding $500,000 for 28,742 pay periods

bas

1  at issue.

2      Plaintiff therefore determined an appropriate range of settlement for PAGA

3  penalties as a percentage of the settlement range that was consistent with other hybrid

4  class/PAGA settlements approved by California courts. *See Dearaujo v. Regis Corp.*,

5  No. 2:14-cv-01408-KJM-AC (E.D. Cal. June 29, 2016), 2016 WL 3549473 at *3

6  (preliminarily approving $1.95 million settlement containing $10,000 PAGA penalties

7  with $7,500 paid to LWDA); *Garcia v. Gordon Trucking, Inc.*, No. 1:10–CV–0324

8  AWI SKO (E.D. Cal. Oct. 31, 2012), 2012 WL 5364575 at *7 (approving $3.9 million

9  settlement containing $10,000 PAGA penalties with $7,500 paid to LWDA); *Chu v.*

10  *Wells Fargo Invst., LLC*, No. C 05–4526 MHP (N.D. Cal Feb. 16, 2011), 2011 WL

11  672645 at *1 (approving $6.9 million settlement containing $10,000 PAGA penalties

12  with $7,500 paid to LWDA); *Guerrero v. R.R. Donnelley & Sons Co.*, Case No. RIC

13  10005196 (Riverside County Super. Ct. July 16, 2013; Judge Matthew C. Perantoni)

14  (gross settlement fund of $1,100,000, of which $3,000 (or 0.3%) was allocated to the

15  settlement of PAGA penalties); *Parra v. Aero Port Services, Inc.*, No. BC483451 (L.A.

16  County Super. Ct. April 20, 2015; Judge Jane Johnson) (gross settlement fund of

17  approximately $1,458,900, of which $5,000 (or 0.3%) was allocated to the settlement of

18  PAGA penalties); *Thompson v. Smart & Final, Inc.*, No. BC497198 (L.A. County

19  Super. Ct. Nov. 18, 2014; Judge William F. Highberger) (gross settlement fund of

20  $3,095,000, of which approximately $13,333 (or 0.4%) was allocated to the settlement

21  of PAGA penalties); *Chavez v. Vallarta Food Enterprises, Inc.*, No. BC490630 (L.A.

22  County Super. Ct. Nov. 10, 2014; Judge William F. Highberger) (gross settlement fund

23  of $1,545,900, of which $10,000 (or 0.6%) was allocated to the settlement of PAGA

24  penalties); *Coleman v. Estes Express Lines, Inc.*, No. BC429042 (L.A. County Super.

25  Ct. Oct. 3, 2013; Judge Kenneth R. Freeman) (gross settlement fund of $1,535,000, of

26  which $1,000 (or 0.1%) was allocated to the settlement of PAGA penalties).

27      Where PAGA penalties are negotiated in good faith and "there is no indication

28  that [the] amount was the result of self-interest at the expense of other Class Members,"

such amounts are generally considered reasonable. *Hopson v. Hanesbrands Inc.*, Case No. 08-00844, 2009 U.S. Dist. LEXIS 33900, at *24 (N.D. Cal. Apr. 3, 2009); *see*, *e.g.*, *Nordstrom Com. Cases*, 186 Cal. App. 4th 576, 579 (2010) ("[T]rial court did not abuse its discretion in approving a settlement which does not allocate any damages to the PAGA claims.").

**7.    The Class Settlement Amount is Fair and Reasonable**

Plaintiff estimated Defendants' maximum potential exposure for all claims at approximately $7.26 million:

| Summary of Defendant's Maximum Potential Exposure | |
|---|---:|
| Meal Period Claim | $2,097,940.00 |
| Rest Period Claim | $2,453,100.00 |
| Minimum Wage Claim | $40,000.00 |
| Wage Statement Claim | $414,850.00 |
| Waiting-Time Penalties | $1,425,552.00 |
| PAGA Penalties | $829,700.00 |
| **Total** | **$7,261,142.00** |

Plaintiff's Counsel determined an appropriate range of recovery for settlement purposes by offsetting Defendants' maximum theoretical liability by:  (i) the strength of Defendants' defenses on the merits; (ii) the risk of class certification being denied; (iii) the risk of losing on any of a number of dispositive motions that could have been brought between certification and trial (e.g., motions to decertify the class, motions for summary judgment, and/or motions in limine) that might have eliminated all or some of Plaintiff's claims; (iv) the risk of losing at trial (including the Court deeming the trial unmanageable on a representative basis); (v) the chances of a favorable verdict being reversed on appeal; and (vi) the difficulties attendant to collecting on a judgment.

The actual Class Settlement Amount of $1,000,000, or approximately 14% of Defendants' maximum potential exposure, accordingly falls within the range of reasonableness. Indeed, courts throughout the county routinely approve settlements that provide a similar discounted range of the maximum potential recovery. *See, e.g., In Re Armored Car Antitrust Litig.,* 472 F. Supp. 1357, 1373 (N.D. Ga. 1979) (settlements

with a value of 1% to 8% of the estimated total damages were approved); *In Re Four Seasons Secs. Laws Litig.,* 58 F.R.D. 19, 37 (W.D. Okla.1972) (approving 8% of damages); *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement of 6% to 8% of estimated damages).

### C.   The Settlement Was Reached through Arm's-Length Bargaining in Which All Parties Were Represented by Experienced Counsel

As discussed above, the Settlement is the result of arm's-length negotiations by experienced counsel. The Parties participated in mediation with the Hon. Michael D. Marcus (Ret.), a respected mediator of wage and hour class actions. Judge Marcus helped to manage the Parties' expectations and provided a useful, neutral analysis of the issues and risks to both sides. A mediator's participation weighs considerably against any inference of a collusive settlement. *See In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure.")  At all times, the Parties' negotiations were adversarial and non-collusive.

The Parties were represented by experienced class action counsel throughout the negotiations resulting in this Settlement. Plaintiff is represented by Capstone. Capstone employs seasoned class action attorneys who regularly litigate wage and hour claims through certification and on the merits, and have considerable experience settling wage and hour class actions. (*See* Perez Decl. ¶¶ 49-55; Banerjee Decl. ¶¶ 2-8.)  Defendants are represented by Littler Mendelson P.C., which operates a respected wage and hour defense practice.

As this Settlement is the "result of arms'-length negotiations by experienced class counsel, [it is] entitled to 'an initial presumption of fairness.'" *Volkswagen*, 2016 WL 4010049, at *14 (internal citation omitted).

**D.    The Parties Conducted a Thorough Investigation of the Factual and Legal Issues**

The Settlement is the product of informed negotiations following extensive investigation by Plaintiff's Counsel. During this matter's pendency, the Parties thoroughly investigated and researched the claims in controversy, their defenses, and the developing body of law. The investigation entailed the exchange of information pursuant to formal and informal discovery methods, including interrogatories and document requests. In response to this discovery, Plaintiff received and analyzed hundreds of pages of documents, including Defendants' written policies regarding the claims at issue, and a representative sample of employee time and punch records. (Perez Decl. ¶ 6.)

Overall, Plaintiff's Counsel performed an exhaustive investigation into the claims at issue, which included:  (1) determining Plaintiff's suitability as a putative class representative through interviews, background investigations, and analyses of his employment files and related records; (2) evaluating all of Plaintiff's potential claims; (3) researching similar wage and hour class actions as to the claims brought, the nature of the positions, and the type of employer; (4) analyzing Defendants' labor policies and practices; (5) researching settlements in similar cases; (6) conducting a discounted valuation analysis of claims; (7) drafting the mediation brief; (8) participating in mediation; and (9) finalizing the Settlement Agreement. The extensive document and data exchanges have allowed Plaintiff's Counsel to appreciate the strengths and weaknesses of the claims alleged against Defendants and the benefits of the proposed Settlement. (Perez Decl. ¶ 7.)

**E.    The Settlement Class Has Responded Positively to the Settlement**

The Settlement Class' response to date demonstrates its support for this settlement—not a single Class Member has objected to the Settlement and only one Class Member has opted out of the Settlement Class. (Perez Decl. ¶¶ 46-47.)  The average settlement payment is approximately $1,324, and a highest payment is approximately $3,123. (Schwartz Decl. ¶ 17.)  A low number of opt-outs and objections

is a strong indicator that a settlement is fair and reasonable. *7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135, 1152-53 (2000) (class response favorable where "[a] mere 80 of the 5,454 national class members elected to opt out [(1.5% of the entire Class)] and . . . [a] total of nine members . . . objected to the settlement); *Churchill Village, LLC v. General Electric*, 361 F.3d 566 (9th Cir. 2004) (affirming settlement approval where 45 of approximately 90,000 notified class members objected and 500 opted out). The Settlement Class' response—both in the low rate of opt-outs and the complete absence of objectors—compares favorably to those cases and warrants final approval.

Likewise, the average Class Member recovery of approximately $1,324 compares favorably to other wage and hour class action settlements for similar claims on behalf of non-exempt employees. *See, e.g., See, e.g., Jones v. Bath & Body Works, Inc.*, No. 2:13-cv-05206-FMO-AJW (C.D. Cal. July 11, 2016) (average net recovery of approximately $50); *Palencia v. 99 Cents Only Stores*, No. 34-2010-00079619 (Sacramento County Super. Ct.) (average net recovery of approximately $80); *Doty v. Costco Wholesale Corp.*, Case No. CV05-3241 FMC-JWJx (C.D. Cal. May 14, 2007) (average net recovery of approximately $65); *Sorenson v. PetSmart, Inc.*, Case No. 2:06-CV-02674-JAM-DAD (E.D. Cal.) (average net recovery of approximately $60); *Lim v. Victoria's Secret Stores, Inc.*, Case No. 04CC00213 (Orange County Super. Ct.) (average net recovery of approximately $35); and *Gomez v. Amadeus Salon, Inc.*, Case No. BC392297 (L.A. Super. Ct.) (average net recovery of approximately $20).

### F.    The Requested Payment to the Settlement Administrator Is Reasonable and Should Receive Final Approval

Plaintiff requests final approval of settlement administration costs in the amount of $15,000. (Schwartz Decl. ¶ 15, Ex. B.)  Rust has promptly and properly distributed the Class Notice to all Class Members and completed its duties in accordance with the settlement terms and the Court's preliminary approval Order. (*See generally* Schwartz Decl.)  Accordingly, the $15,000 payment is fair and reasonable and should be accorded

1  final approval along with the rest of the Settlement terms.

2  **IV.    CONCLUSION**

3          The Parties have negotiated a fair and reasonable settlement of a case that

4  provides relief that likely would never have been realized but for this class action.

5  Accordingly, final approval of the Settlement should be granted.

6

7  Dated:  April 5, 2019                          Respectfully submitted,

8                                                Capstone Law APC

9                                        By: /s/ Raul Perez
                                              Raul Perez
10                                             Arnab Banerjee
                                              Brandon Brouillette
11
                                              Plaintiff James Mortley
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28